UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| J.A., THE MINOR STUDENT, BY AND THROUGH S.A. and C.A., THE STUDENT'S PARENTS<br>Plaintiffs, | )<br>)<br>)<br>)<br>) |
| v. | )<br>) |
| WILLIAMSON COUNTY BOARD OF EDUCATION; AND STATE OF TENNESSEE DEPARTMENT OF EDUCATION<br>Defendants. | )<br>)<br>)<br>) |

## COMPLAINT

**COMES THE PLAINTIFFS, J.A.,** through his parents, S.A. and C.A., filing this Complaint against Williamson County Board of Education and the Tennessee Department of Education. They show:

### I.   PARTIES, JURISDICTION AND VENUE

1. J.A. resides with his mother and father, C.A. and S.A., in Williamson County, Tennessee. J.A. has a qualifying disability under the Individuals with Disabilities Education Act ("IDEA") that adversely impacts his education and requires special education.

2. Williamson County Board of Education ("WCBOE" or "WCS" or "BHS") is the legal entity charged with administering public education to students

in Williamson County, Tennessee.  It receives state and federal funding to provide special education to persons with a disability under the IDEA.

3. Defendant Tennessee Department of Education ("TDOE") is the state education agency ("SEA") with the responsibility for ensuring that mandates of the IDEA are carried out by the local education agencies, of which Defendant WCBOE is one.  "Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. §1415(a).

4. Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

5. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391(b), as Plaintiffs reside within the Middle District of Tennessee and all events and omissions giving rise to this Complaint occurred in this judicial district.

6. Administrative exhaustion of the underlying case (APD Case No. 07.03-230316J) occurred through a state due process hearing with a Final Order by Administrative Law Judge ("ALJ" or "state hearing officer") Richard M. Murrell dated November 21, 2023.  This appeal is timely brought within sixty (60) days

after the issuance of the Final Order in the administrative proceeding issued November 21, 2023.

## II. INTRODUCTION

7. J.A. had an existing IDEA eligibility from another state in the spring of 2021 when his family decided to move to Brentwood, Tennessee. His local public school district had decided he needed a private placement in order to receive a free appropriate public education ("FAPE"). The family notified Defendant WCBOE of their move that spring and that they were seeking special education services (including a determination of an appropriate placement) for J.A.

8. In their due process complaint, the Plaintiffs alleged that Williamson County Schools failed to timely[1] evaluate J.A.; that it had no legal justification to not evaluate him during its summer break; that it failed to make J.A. eligible for special education services in their district within a reasonable amount of time; that Williamson County Schools failed to offer comparable services to J.A. including, but not limited to, the provision of ESY.[2]; that WCS predetermined J.A.'s placement and accommodations; that it did not use the required continuum of placements by considering alternatives to Brentwood High School; that it failed to

---

[1] Plaintiffs notified WCS of their pending move, registered online, and provided WCS a copy of J.A.'s IEP from LAUSD in May of 2021 prior to summer break.
[2] ESY means extended school year service for eligible students which provides qualified students with special education services "beyond the normal school year." 34 CFR 300.106

develop an appropriate IEP; and, that it prohibited J.A. from getting a regular diploma if he asserted his right to an accommodation.

9. As shown further herein the Plaintiffs succeeded at proving their case. *De novo* review is required, however, because the Plaintiffs were not provided with a fair adjudication. The state hearing officer's order is simply a feckless cut and paste job from a prior ruling. This includes copying verbatim the essential conclusions of law rendered in the previous unrelated case. This is an ongoing practice in the Tennessee due process system where state hearing officers frequently copy each other's work. It is done wantonly and in doing so deprives the parents and students of a fair, impartial hearing result.

10. Defendant TDOE is responsible for providing an impartial due process hearing. 20 U.S.C. §1415(f)(1)(A). This includes the responsibility of providing an impartial hearing by a hearing officer that "possess[es] knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to this chapter, and legal interpretations of this chapter by Federal and State courts; (iii) possess[es] the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and (iv) possess[es] the knowledge and ability <u>to render and write decisions</u> in accordance with appropriate, standard legal practice."

### III. THE UNDERLYING CASE

11. These facts were developed over the course of a hearing spanning five days in-person, in addition to testimony taken by deposition (one by video), as well

as two video recorded IEP meetings. Most material facts were completely undisputed. In rare instances where the facts were disputed, Plaintiffs carried their burden of persuasion. The credibility of the Petitioners' witnesses was never impeached and the Plaintiffs had the overwhelming proof.

12. J.A. and his family reside in Brentwood, Tennessee having moved there from Los Angeles. For the 2020-21 academic year J.A. and his siblings attended school in Los Angeles. J.A. was placed by a Los Angeles Unified School District ("LAUSD") IEP team in a non-public (private) school, Summit View West.

13. J.A. first had an IEP dating back to preschool. By the third grade it was determined that J.A. had Attention-deficit/hyperactivity disorder ("ADHD"), a processing disorder, and was recognized as an auditory learner. He also began medication. His disability exhibited in an inability to focus and the need for constant redirection. Then anxiety emerged in the fourth grade. By his fifth-grade year his anxiety was causing him to pick incessantly at himself and he was getting professional treatment. Previously with his IEP, the LAUSD team had tried "push-in" and "pull-out" services. Push-in and Pull-out, as described by C.A., is exactly what Defendant WCBOE proposed when it designed an IEP with an extra teacher in the room or occasionally removing J.A.

14. As far back as the fifth grade, J.A. was picking his face to the point of harming himself. He presents with open sores on his face and continually picks the sores. J.A. also self-harms by picking his legs and pulling out sections of his

hair. He has picked his fingers to the extent that he no longer has fingernails. As all the experts in this case agree that this has led to bullying.

15. The LAUSD IEP team decided that an appropriate education for J.A. was a smaller non-public school. His parents toured Summitt View West, as well as other offerings by LAUSD, then applied, and J.A. was placed there by the IEP team before commencement of the next school year (ESY prior to his sixth-grade year).

16. Summit View West had 11 or 12 students in J.A.'s entire grade. In J.A.'s seventh and eighth grade the classes were even smaller. At that time, he exhibited a lot of attention issues, learning disabilities, and anxiety. Small class size really made a difference for J.A. J.A. made progress socially and his anxiety subsided. J.A. even chose to go to school in-person during the COVID-19 pandemic at a time where in-person attendance was optional. While at Summit View J.A. had extra time and a reader. Read aloud was provided because J.A. had an identified individual need for it, and it was in his IEP.

17. J.A. improved and made progress at Summit View. He was less anxious, did better in classes, made friends. His excoriation improved as well.

18. During the summer of 2020 the parents began considered moving from Los Angeles. They spent a summer in Utah that year made feasable by Summit View's offering of necessary ESY services virtually. Nashville was familiar to S.A. because of his vocation in the music industry. The parents visited Nashville

with a view toward relocating in February 2021. On February 24, 2021, after calling to schedule an appointment, they toured Brentwood High School ("BHS").

19. During their tour of BHS they met with a BHS special education specialist. They described J.A.'s then existing accommodations in his current IEP and the special education representative explained that what they described as 'accommodations' would in fact be 'modifications' at BHS therefore J.A. would not be on a regular diploma track. It was also explained during the tour that in Tennessee J.A. could not opt out of state-mandated testing and that the results of these tests are a component of J.A.'s school assigned grades. And the parents were directly told that there were no small class sizes available for students like J.A.

20. The day of the BHS tour, the parents also went house hunting and entered into a contract on a home on which they would close thirty days later. On this trip to Tennessee the parents also visited Currey Ingram Academy and Benton Hall Academy and made an online application to Currey Ingram following their BHS tour. The application was not approved for another two months as it required references as well as J.A. spending time on at their campus "shadowing."

21. Subsequent to the visit to Nashville, J.A.'s LAUSD IEP team met on March 15, 2021 as a matter of its responsibility to review his IEP annually. In designing an IEP for J.A. the team could not automatically re-place him at Summit View, but instead was required to undertake a Least Restrictive Environment ("LRE") analysis. It involved a calculated discussion of answering six separate questions, all of which weighed in favor of J.A.'s continued placement in a non-

public school setting. The IEP team listed J.A.'s instructional accommodations to include small class setting and others; and, importantly the LAUSD IEP called for J.A. to receive ESY.

22. At about the same time Dr. Lev Gottleib updated J.A.'s neurological testing. His prior testing was out of date and the update was required by Currey Ingram and is a part of triennial review of his IEP. It was eventually provided to Williamson County Schools.

23. Dr. Gottleib is an expert in clinical neuropsychology. Dr. Gottleib diagnosed J.A. with ADHD combined presentation; developmental coordination disorder; specific learning disorder with impairment in reading accuracy, mathematics, and written expression; generalized anxiety disorder; and excoriation disorder. J.A.'s weaknesses are described as attention- inhibition, sustaining effort, shifting attention, multitasking attention. Inhibition- controlling himself, shifting from one thing to another and (executive functions). They overlap with ADHD and anxiety. J.A. overtly has sensory sensitivities and dysregulations, and his learning and memory are inefficient. As a consequence, his academics were low given his engagement and efficiency. Dr. Gottleib recommended specialized education, delivered in a small setting in addition to the psychological and psychiatric therapies. According to Dr. Gottleib, J.A. is susceptible to bullying given the picking, his size, and disposition.

24. Dr. Gottleib's testing was validated by both Defendant WCBOE and its retained expert.

25. At hearing Dr. Gottleib explained the necessity of a small class setting. J.A. is inefficient. The more noise and more people or more things that you add, the more efficiency burden. "That's where a lot of the small-class science comes from. It comes up viscerally in skin picking. But it's really fundamentally related to an inefficiency within busy perceptual and motor realms. And the more people in a room the more you experience that demand." Dr. Gottleib's recommendation for a small class setting was undisputed by the school psychologist.

26. Defendant WCBOE expert psychologist fully agreed with Dr. Gottleib's report in terms of his identification of J.A.'s weaknesses and it how affects his esteem. He likewise agreed that J.A. was "an ongoing risk for bullying and floundering in large, mainstream settings." And he endorsed Dr. Gottleib's recommendation of a small class setting and emphasized it was important.

27. There are no small pull-out classes for students on a diploma track at BHS.

28. There are no schools similar to Summit View operated by WCS.

29. WCS does not have special schools. During the relevant time period WCS offered a virtual school option. It also runs a much smaller high school, Renaissance. Neither of these options were ever discussed with the parents.

30. In late April 2021 J.A.'s was accepted at Currey Ingram.

31. On or about May 7, 2021 S.A. registered all three of his children online and notified the BHS principal Kevin Keidel that J.A. was registered, had an IEP and that they were interested in next steps. Principal Keidel told his staff to

commence the process and never expressed a reservation to wait for anything. Staff contacted S.A. the next day seeking a copy of J.A.'s IEP, which S.A. sent, and any recent testing. That was the last meaningful step taken for nearly three months.

32. The school psychologist admitted failing to speak to the parents in May 2021, despite her telling another staff member she had some initial questions for them. She failed to do this because commencing an evaluation at that time would interfere with her summer break. Nevertheless there were several school other psychologists available to complete J.A.'s eligibility in June and July.

33. Staff only "skimmed" over the IEP, did not look at it thoroughly, and did not remember seeing the reference to ESY.

34. One thing was apparent, even during a cursory review, was that J.A. "Definitely has needs!" and "heavy needs".

35. After nearly two full months of silence and neglect from WCS S.A. sent an email to staff reminding them of J.A.'s registration and attaching Dr. Gottleib's recently completed report. After the passage of another week, Defendant WCBOE replied stating that they would be "back in the building on August 2nd."

36. The next time S.A. heard about WCS's interest in J.A. was a few days before classes were to start and he was sent an email to discuss course selection. S.A. reiterated his concerns about the neglect of J.A.'s IEP considerations and placement. This alert gained the attention of staff and the WCS wrote and discussed its obligation to "match the IEP as much as possible" and then

predetermined that "J.A. will have all the support and services at Brentwood High School that meet his needs." On August 2, 2021 S.A. was invited to meet with staff, but not as an IEP meeting. WCS invited J.A. to attend and suggested that he could just sit in an office if he could not go to class.

37. A telephone conversation occurred with the parties that caused WCS to discuss two private schools, Genesis Academy and High Road Academy, that BHS suggested were comparable placements. S.A. reached out to Genesis Academy and attempted to schedule a tour. He learned that he and J.A. could not see the school when education was taking place. He later learned that BHS rescheduled his tour without asking him. Since he could not see the school operationally, S.A. conducted a phone interview of its head of school where he learned that Genesis has no concern if any of its students matriculate to college.

38. On August 10, 2021 S.A. wrote BHS explaining that J.A. was not eligible for special education services in WCS; that he was enrolled in a private placement; that they would continue with an eligibility meeting; and, that they would seek funding for the private placement from Defendant WCBOE.

39. On August 20, 2021 the parents participated in an Eligibility meeting with WCS. According to the minutes of the meeting, that until an IEP was developed BHS would use the LAUSD IEP and it was explained to the parents that "there are not a lot of schools like the one J.A. attended in California." The minutes make the statement, "J.A. is eligible as of today." A prior written notice ("PWN") was issued by the school and the parents filed a written disagreement to its

contents. S.A. pointed out that the school misrepresented the timeline of events by suggesting that the parents had not contacted the school until July 29th. S.A. described some features of Currey Ingram: individualized learning plans that list accommodations and track J.A.'s progress; a degree that would allow J.A. to go to a four-year college; and, accommodations that do not affect J.A.'s diploma track, for example read aloud and no required state testing. It was also pointed out that J.A.'s IEP at all times called for a *small class setting*, not a small learning environment.

40. Defendant WCBOE has acknowledged that LAUSD IEP "had appropriate accommodations documented" and they "were used consistently."

41. Defendant WCBOE eventually designed an IEP for J.A. that placed him in the general education setting at BHS. The IEP was designed without a read aloud accommodation. Small class environment was not offered to JA in the WCS IEP.

42. Per the Defendant WCBOE, were J.A. given the accommodation of read aloud for state testing it would prohibit J.A. from getting a regular education diploma.

43. There is no evidence that the IEP team even deliberated read aloud at all as an accommodation. This was conceded by the Defendant WCBOE's witnesses at hearing. The only criteria used for denial was misapplication of a proven to be erroneous interpretation of state law for which Defendant TDOE admonished Defendant WCBOE.

44. Read aloud is available to students with an IEP, Section 504 plan, individualized learning plan, and is not limited to students based on their disability of vision impairment, reading fluency, or basic reading skills.

45. J.A.'s need for read aloud is further substantiated by the fact that he has received that accommodation for use in ACT testing.

46. J.A. has a "reading disability" exceptionality. Among other things that qualifies him for interventions services. There was no discussion of J.A.'s need to use this accommodation, nor was any data concerning its past use and effectiveness vs. ineffectiveness discussed. The only thing that mattered to the IEP team was that J.A. could not use it for state testing because he did not have a deficit in basic reading, reading fluency, or have a vision impairment. That conclusion is incorrect as a matter of law.

47. There was a plethora of evidence that J.A. could not be served at BHS. The school IEP team intentionally ignored Dr. Gottleib's findings, the LAUSD IEP, J.A.'s history in small schools vs. large schools, and its psychologist's lack of disagreement with Dr. Gottleib's findings and the parents' reports.

48. J.A. was not offered a behavior plan in his WCS IEP or a Behavior Specialist. The IEP team never even considered it, even though they specifically stated that it was a reason J.A. could be served at BHS.

49. The IEP and its placement decision was predetermined.

50. It was an IEP that the Defendant WCBOE admitted would not be "pretty in the beginning." A typical U.S. History class at BHS would have 25

students, maybe as many as 30. There are no core academic classes at Brentwood High with class sizes of 10-12 students. A typical English class has 27 students.

51. The IEP team never offered J.A. a small class setting.

52. Defendant WCBOE has a policy and practice of prohibiting disabled students from being afforded non-public school settings unless they demonstrate aggressive behavior.

53. The IEP team never considered a full continuum of placements.

54. WCS in fact has a high school with a significantly smaller population and where it has smaller class sizes. Like the option of its virtual high school program, the WCBOE never suggested that J.A. could be considered for those options.

55. The state hearing officer abated doing any fact finding on multiple issues raised in the complaint at hearing.

56. The state hearing officer further found facts that literally were not in existence. For instance, as a factual basis for the ALJ's decision it was found, "BHS and WCS, generally, are known as having a robust special education program within the state of Tennessee." No such fact was introduced at the hearing (and it would be legally and factually objectionable if had it been offered).

57. The conclusions of law are not the conclusions of the state hearing officer, but were instead the conclusions made by another hearing officer in at least one other case.

58. Defendant TDOE has failed to train, supervise, monitor or evaluate a team of hearing officers that hear special education due process cases. This has resulted numerous decisions throughout the state of Tennessee that were recently discovered to be cut and paste jobs from other decisions, effectively turning some of Defendant TDOE's hearing officers into mimeographs.

59. With just the benefit of one single review, the Plaintiffs identified 37 of the ALJ's 71 conclusions of law were duplications of the decision of *G.C.A. The Student, W.A. The Parent, Petitioner, v. Williamson County Schools*.[3]

60. This is a systemic problem with TDOE's hearing process.

61. In another case this District Court admonished one hearing officer in a remand where the hearing officer copied and pasted nearly entirely a proposed order offered by Defendant WCBOE.

62. Recently in another case in the Western District of Tennessee a student's decision was a merged cut and paste job of three prior decisions.

63. The TDOE is so disinterested in the perception of objectivity of its hearing officers that it evidently did not convey these concerns in advance of the decision in this case, allowing this to occur here.

64. Because the federal government monitors TDOE and has determined that TDOE needs help implementing the IDEA, Defendant TDOE favors this because the outcome of hearing decisions may reflect negatively on its operations.

---

[3] That order itself contains wholesale duplication from at least one other ALJ's order.

## IV. LEGAL CLAIMS

65. The foregoing facts are incorporated.

66. Williamson County Schools failed to offer comparable services to J.A. including, but not limited to, the provision of ESY and a small class size.

67. Defendant WCBOE predetermined J.A.'s placement and accommodations. Defendant WCBOE failed to offer students, and J.A. in particular, a continuum of placements as required by the IDEA.

68. Defendant WCBOE failed to evaluate J.A. for special education services in a timely manner.

69. Defendant WCBOE failed to have an IEP in place prior to the start of the 2021-2022 school year.

70. Defendant WCBOE failed to develop an appropriate IEP.

71. Defendant WCBOE prohibited J.A. from getting a regular diploma if he asserted his right to an accommodation.

72. Defendant TDOE has failed to ensure it provides students in Tennessee with the procedural protections of the IDEA, including the obligation to provide parents and students with an impartial due process hearing.

73. Defendant TDOE had failed to ensure that its hearing officers have the capacity to comply with the IDEA.

74. Defendant TDOE has failed to sufficiently train its hearing officers to competency with respect to the procedural protection afforded students under the IDEA.

75. Defendant TDOE has failed to supervise and monitor its hearing officers.

76. Defendant TDOE has violated the Plaintiffs' rights to due process under the 14th Amendment.

77. The claims against Defendant TDOE are systemic.

## IV. RELIEF

78. Based upon all of the facts, and the violations of the IDEA, Plaintiffs seek:

   A. Supplementation of the record with additional evidence;

   B. Declaratory relief that WCBOE violated J.A.'s rights under the Individuals with Disabilities Education Act, to a free, appropriate public education;

   C. Declaratory relief that WCBOE violated the FAPE rules of the IDEA;

   D. Reimbursement of all privately expended educational supports;

   E. Continued placement at J.A.'s current school, Currey Ingram, which is a private school specializing in educating children with learning differences;

   F. Reimbursement to J.A.'s parents for his transportation to and from the Currey Ingram;

G. A declaration that the TDOE violated J.A.'s rights under the Individuals with Disabilities Education Act by failing to ensure the District's compliance with the IDEA and by failing to provide an impartial due process hearing and properly trained hearing officers;

H. An order compelling Defendant TDOE to develop policies and procedures to ensure that due process complaints are heard by competent state hearing officers (and/or administrative judges) with the skill and proficiency of writing orders that are as unique as the child and the case before him or her;

I. An order compelling Defendant TDOE to develop policies and procedures to monitor compliance with their policies and programs by the District, and that students are receiving fair and impartial due process hearings

J. All reasonable attorneys' fees and costs expended through the due process proceeding, and for this action; and

        Respectfully submitted,

        <u>/s/ Michael F. Braun</u>
        MICHAEL F. BRAUN (BPR 032669)
        5016 Centennial Boulevard, Ste. 200
        Nashville, TN 37209
        (615) 378-8942
        Fax: (629) 255-4445
        Email: mfb@braun-law.com

        ***ATTORNEY FOR PLAINTIFFS***